# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 22-1552V

| | |
|---|---|
| REGINA A. GREBB,<br><br>                      Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                      Respondent. | Chief Special Master Corcoran<br><br>Filed: May 16, 2025 |

*Jeffrey A. Golvash, Golvash & Epstein, LLC, Pittsburgh, PA*, for Petitioner.

*Sarah B. Rifkin, U.S. Department of Justice, Washington, DC*, for Respondent.

## DECISION AWARDING DAMAGES[1]

On October 19, 2022, Regina Grebb filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered Guillain-Barré syndrome ("GBS") after receiving an influenza ("flu") vaccine on November 1, 2020. Petition at 1. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters. Although entitlement was conceded, the parties could not resolve damages, and therefore the dispute was resolved at a "Motions Day" proceeding held on April 30, 2025.

---

[1] When this Decision was originally filed, I advised my intent to post it on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). In accordance with Vaccine Rule 18(b), Petitioner filed a timely motion to redact certain information. This decision is being posted with Petitioner's name redacted to reflect his initials only. Except for those changes and this footnote, no other substantive changes have been made. This Decision will be posted on the court's website and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc with no further opportunity to move for redaction.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

For the reasons set forth below, I find that Petitioner is entitled to an award of damages in the amount of **$165,656.19, comprised of $165,000.00 for actual pain and suffering, plus $656.19 in unreimbursable expenses.**

## I.   Relevant Procedural History

The case was activated on January 26, 2023 (ECF No. 10). Entitlement was found in Petitioner's favor after Respondent's concession on September 7, 2023. (ECF No. 20). However, the parties reached an impasse in their damages discussions, and on April 24, 2024, Petitioner filed her brief addressing damages (ECF No. 32). Respondent filed his response on June 10, 2024 (ECF No. 33), and Petitioner replied on July 10, 2024. (ECF No. 34).

On March 26, 2025, the parties filed a joint status report confirming that they were amenable to an expedited hearing. The Motions Day hearing occurred as scheduled on April 30, 2025, and this written decision memorializes my oral ruling issued at the conclusion of the hearing.[3]

## II.   Relevant Factual Evidence

### A. Medical Records

At the time of vaccination, Petitioner was a sixty-nine-year-old retired nurse. Exhibit ("Ex.") 2A at 21. Her medical history included diabetes, obesity, hypertension, hyperlipidemia, glaucoma, allergies, and sciatica with chronic back and leg pain. Ex. 2A at 68, 70, 109, 111; Ex. 4A at 116. Prior to vaccination, Petitioner established care with a new primary care provider ("PCP"), Jennifer DiRocco, D.O. Ex. 2A at 70. At her first visit on June 2, 2020, petitioner was diagnosed with diabetes after displaying a high A1C level (10.5). *Id.* at 111. Dr. DiRocco prescribed metformin and recommended diet and exercise modifications to promote weight loss. *Id.* at 73, 111. Petitioner received a pneumococcal conjugate vaccine at this visit. *Id.* at 78. Several months later, on October 14, 2020, she received a Shingrix vaccine at her PCP's suggestion. *Id.* at 39. She has not alleged any injury based on these vaccines.

On November 1, 2020, Petitioner received a flu vaccine at her local pharmacy. Ex. 3 at 1. On November 16, 2020, she saw Dr. DiRocco for a suspicious skin lesion on her scalp. Ex. 2B at 165-167. She did not mention any limb weaknesses or neurological

---

[3] That ruling will be set forth in the transcript from the hearing, which has not yet been filed but is fully incorporated into this Decision.

symptoms at this visit. *See id.* However, several days later, on November 19, 2020, Petitioner telephoned Dr. DiRocco's office to report tingling in her hands and feet. *Id.* at 181, 184. She stated that she "woke up [on Tuesday November 17, 2020] with her hands and feet all tingly." *Id.* at 185. She spoke with a nurse in Dr. DiRocco's office and proceeded to the emergency room ("ER"). *Id.*

At the ER, Petitioner reported tingling in her extremities, and weakness in her legs. Ex. 4A at 10. Petitioner's lab work and physical exam showed no abnormalities. *Id.* Petitioner displayed full sensation and full strength, and she could raise her legs without difficulty. *Id.* Her right-sided patellar reflexes were diminished, but petitioner explained that this was normal for her. *Id.* Petitioner felt comfortable ambulating and noted that she already had a cane and walker at home if she required assistance. *Id.* She was discharged home. *Id.*

On November 21, 2020, Petitioner was transported back to the ER by ambulance after twice falling in her home. Ex. 4A at 96. Petitioner reported increased weakness in her legs and tingling in her hands. *Id.* at 84. An ER physician suspected GBS, and Petitioner was admitted for further testing, including a lumbar puncture. *Id.*

Petitioner was hospitalized for six days. Ex. 4A at 125. During her stay, she displayed diminished deep tendon reflexes in her upper and lower extremities. *Id.* A lumbar puncture revealed elevated protein, consistent with GBS. *Id.* Petitioner received a five-day course of intravenous immunoglobulin ("IVIG"). *Id.* She experienced some episodes of hypertension during this treatment, but her blood pressure stabilized with medication. *Id.* Her leg weakness slowly improved, and, on November 27, 2020, she was discharged to an inpatient rehabilitation unit with a diagnosis of GBS. Ex. 4B at 289. She was advised to follow up with outpatient care and was prescribed a short course of tramadol and a lidocaine patch for musculoskeletal back pain. Ex. 4A at 125.

Petitioner arrived at inpatient rehabilitation with significant mobility issues and required assistance for bathing, toileting, and ambulating. Ex. 5A at 49-50. She reported that she "ha[d] always had some decrease in sensation at the left leg," even prior to her GBS diagnosis. *Id.* at 68. Petitioner received eighteen days of inpatient occupational and physical therapy.[1] *Id.* at 61. Upon her discharge on December 15, 2020, she showed improvement and was able to ambulate 150 feet with a rolling walker and navigate stairs with supervision. *Id.* at 66.

Petitioner lived alone and was unable to navigate the stairs in her two-level house without assistance. Ex. 6A at 13; Ex. 2B at 201. After her discharge from inpatient rehabilitation, she moved in with her sister. *Id.* On December 18, 2020, Petitioner

3

underwent a home health evaluation. Ex. 6A at 13. She received in-home occupational and physical therapy through January 25, 2021. *Id.* at 21-22.

On February 3, 2021, Petitioner saw neurologist George Small, M.D., for outpatient follow-up care. Ex. 8 at 5-7. Petitioner stated that she felt "about 70% better in terms of her strength and her numbness." *Id.* at 7. She exhibited intact reflexes and could "minimally walk with assistance." *Id.* That same day, petitioner underwent EMG/NCS testing, which showed evidence of demyelination consistent with GBS. Ex. 8 at 7, 42. Dr. Small opined that Petitioner's GBS was "in the improvement state." *Id.* at 7. He did not recommend immunosuppressants but suggested that petitioner resume her physical therapy regimen. *Id.*

Petitioner returned to Dr. Small on May 5, 2021, for a final neurology visit. Ex. 8 at 51. She was walking on her own, although she sometimes required assistance. *Id.* The tingling in her hands had largely dissipated, and she was able to drive. *Id.* Dr. Small opined that Petitioner's diagnosis "clearly was acute Guillain Barre syndrome 2 weeks after a flu vaccination." *Id.* He noted the "low risk of recurrence" and advised petitioner to return for follow-up care as needed. *Id.*

On August 30, 2021, Petitioner saw her PCP, Dr. DiRocco, for an annual wellness exam. Ex. 9 at 16. Petitioner was able to walk independently but was using a cane for balance. *Id.* She had not returned for any additional physical therapy and admitted she was "not really exercising at all." *Id.* Petitioner had returned to her own home and was "[i]ndependent with mobility and self-care." *Id.* at 20.

On March 7, 2022, Petitioner returned to Dr. DiRocco for diabetes and hypertension care. Ex. 10 at 2. Petitioner was still using a cane for balance but was "improving" and did not have her cane with her during her appointment. *Id.* She had not completed any additional therapy and was "no longer seeing Dr. Small for neurology" care. *Id.* Petitioner had begun a new job at a local zoo but was "[s]till not really exercising at all." *Id.*

### B. Declarations

Petitioner submitted three signed affidavits in support of her claim. Exs. 7, 12, 13. The first affidavit, executed on October 13, 2022, and filed on November 20, 2022, speaks to the course of Petitioner's GBS onset and symptoms. *See generally* Ex. 7. Petitioner's second affidavit, executed on March 30, 2024, appears to be a standard form upon which Petitioner has chosen from a number of pre-written alternatives to best describe her condition. *See generally* Ex. 12.

4

The third affidavit, executed on April 23, 2024, and filed into the record the following day, recounts the impact of Petitioner's GBS on her daily life. Petitioner recounts that prior to her GBS, she enjoyed walking for exercise, hiking, housework, yardwork, and providing care for her elderly father. Ex. 13 at 1. Petitioner also indicates that she was searching for part-time work as a registered nurse to supplement her Social Security and pension. *Id.* at 2. It took nearly three months after her illness for Petitioner to be able to live on her own again, and that even then she was still unable to drive herself and required the help of her family for transportation and for shopping trips. *Id.* She also reports that although her condition has slowly improved, she still experiences tingling and loss of sensation in her feet, occasional loss of balance, inability to walk long distances, and fatigue from walking sometimes necessitating the use of a cane and that her GBS residuals have curtailed activities she previously enjoyed such as hiking and yardwork. *Id.* at 3. Petitioner also indicated that she would be unable to resume a career in nursing because she is physically unable to perform CPR and has been advised by treating physicians to not receive any more flu vaccines. *Id.* at 2.

### III.     Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims.[4] *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

### IV.     The Parties' Arguments

Petitioner requests $180,000.00 for pain and suffering, and in support cites the following cases: *Francesco v. Sec'y of Health & Hum. Servs.*, No. 18-1622V, 2020 WL 6705564 (Fed. Cl. Spec. Mstr. Oct. 15, 2020) (awarding $165,000.00); *Dillenbeck v. Sec'y of Health & Hum. Servs.*, No. 17-428V, 2019 WL 4072069 (Fed. Cl. Spec. Mstr. Jul. 29, 2019) (awarding $170,000.00); *Presley v. Sec'y of Health & Hum. Servs.*, No. 17-1888V, 2020 WL 1898856 (Fed. Cl. Spec. Mstr. Mar. 23, 2020) (awarding $180,000.00); and *McCray v. Sec'y of Health & Hum. Servs.*, No. 19-277V, 2021 WL 4618549 (Fed. Cl. Spec. Mstr. Aug. 31, 2021) (awarding $180,000.00).

Petitioner argues that her case is similar to those cited above, given common factors such as the necessity of hospitalization and inpatient rehabilitation and/or physical therapy, and on-going GBS sequelae that continue to affect Petitioner's daily living to this day. Pet's Brief at 16-18. Petitioner has also requested $1,360.33 for past unreimbursed expenses.

Respondent has countered with a proposal of $92,500.00 for pain and suffering, plus $656.19 for out-of-pocket expenses. Respondent notes that Petitioner experienced a moderate course of GBS with a good recovery and only limited continuing treatment. Respondent also argues that Petitioner's comparable cases are distinguishable, because those individuals all experienced a more severe form of GBS in some way (e.g., longer hospitalization, worse pain, and a longer recovery). *Id.* at 11. Respondent has offered *Granville v. Sec'y of Health & Hum. Servs.* as better comparable cases. *Granville v. Sec'y of Health & Hum. Servs,* No. 21-2098V, 2023 WL 6441388 (Fed. Cl. Spec. Mstr. Aug. 30, 2023).

---

[4] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of GBS claims, were assigned to former Chief Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

## V. Appropriate Compensation in this Case

### A. Pain and Suffering

In arriving at a pain and suffering award, I review the facts and circumstances of the petitioner before me, in the context of other cases and precedent. GBS is a particularly concerning and frightening condition, and the pain and suffering award should reflect that. Reasoned decisions, rather than cases resolved on proffer, provide the best comparable cases for arriving at an award when the parties are unable to resolve damages through negotiations. But ultimately the facts of the case at issue are the most significant factor.

Here, the record establishes that Ms. Grebb experienced a moderate case of GBS. Although she required hospitalization and inpatient rehabilitation, her overall stay was not as protracted as in other, more severe presentations. More severe than usual, however, was the course of Petitioner's outpatient rehab, which lasted for 39 days. Petitioner also had to stay with her sister for approximately three months because she was unable to navigate her two-story house on her own. Petitioner required a Gabapentin prescription for approximately 15 months to help manage her symptoms. However, Petitioner ultimately appears to have made a fairly good recovery. By February 3, 2021, approximately 2.5 months after the first manifestation of her GBS symptoms, she reported to her neurologist that she felt about 70% better. From then on, Petitioner appears to have made slow but steady progress and although she has reported some intermittent tingling and numbness in her feet and occasional loss of balance and fatigue, she appears to be able to do many of the things she used to do prior to her GBS and has not required long-term care from a neurologist.

Thus, the overall course of Petitioner's GBS was slightly less severe that what was experienced by the claimants in the proposed comparable matters. For example, the *Presley* petitioner had previously had one leg amputated, and had only recently become ambulatory again from a prosthesis; endured a longer hospitalization with several painful unsuccessful attempts at a lumbar puncture; and lived alone in a remote area, which made care for his recovery even more difficult. *Presley*, 2020 WL 1898856, at *11-12. Similarly, the petitioner in *Dillenbeck* required 14 days of hospitalization followed by six days of inpatient rehabilitation, plus live-in care from three adults for approximately five to six months thereafter. *Dillenbeck*, 2019 WL 4072069, at *2-4. Additionally, upon returning to work that petitioner was unable to perform the duties of her prior job and had to take a different, less physically taxing job that also had lower wages. *Id.*

On the other end of the spectrum, Respondent's single proposed comparablecase involves a too-low award, because the course and impact of the *Granville* petitioner's GBS was less severe than the instant case. The petitioner in *Granville* was a 28-year old woman, much younger than Ms. Grebb and therefore expected to make a more complete recovery. And in fact that individual was hospitalized for less time, required less physical therapy, and by all accounts made a quick and full recovery. *Granville*, 2023 WL 6441388,

7

at *4-5. Ms. Grebb, on the other hand, has had a slower recovery necessitating a long period of time taking Gabapentin and although she has made a good recovery, she is unlikely to ever reach her pre-GBS baseline and still is unable to do certain tasks she used to enjoy, such as gardening and hiking.

Based upon the facts of this case and the reasoning contained in this decision as well as my oral ruling at the April 30, 2025, hearing, I find that Petitioner should be awarded $165,000.00 for her past pain and suffering – a sum lower than what she demands, to account for her slightly less-severe experience (while not nearly as low as Respondent proposes).

### B. Unreimbursable Expenses

Petitioner has requested $1,360.33 as reimbursement for personally incurred costs for medical co-payments and prescription drug expenses. In his Response brief, Respondent highlighted twelve line-items that he argued were not appropriate for compensation because they are either unrelated to Petitioner's GBS or because they were unsubstantiated by the medical records and argued that $656.19 is the appropriate amount for Petitioner's substantiated unreimbursable expenses. Resp. at 12-14. Although Petitioner filed a Reply brief, she did not address Respondent's argument concerning these expenses.

At the oral argument, I gave Petitioner's counsel an opportunity to address the concerns about these costs raised by Respondent's brief. Petitioner's counsel indicated that he was unable to substantiate the requested costs beyond what he had already provided. Petitioner was afforded ample chance to substantiate these requested costs but has failed to do so. Therefore, Petitioner is ultimately awarded the lesser sum of $656.19 for her past unreimbursable expenses.

### Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $165,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.[5] I also find that Petitioner is entitled to $656.19 in actual unreimbursable expenses.**

**I therefore award Petitioner a lump sum payment in the amount of $165,656.19 to be paid through an ACH deposit to Petitioner's counsel's IOLTA**

---

[5] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

**account for prompt disbursement to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[6]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**

Brian H. Corcoran
Chief Special Master

---

[6] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.